for 22-2799 Kenlock v. Orange County. May I proceed, Your Honor? May it please the court, my name is James Meyerson, and along with my co-counsel, Michael Reines, we represent the appellant Orville Kenlock in this matter. This litigation was commenced in the Southern District of New York in May of 2020, arising out of a series of incidents that occurred when Orville Kenlock was a pre-trial detainee in the Orange County Correctional Facility or Jail. A series of incidents occurred in a very defined period of time, commencing on June 9th of 2018, and continuing thereafter on June 23rd. July 17th, an area of two incidents, and on July 27th. Again, he was a pre-trial detainee during that period of time. On September 30th, 2022, a judge, the district court dismissed the plaintiff's claims for lack of plausibility. He asserted nine causes of action, and a timely appeal has been filed to this court. And we're focusing only on five of those causes of action. We're not litigating in the appellate context for those claims. Three of the claims are against the security officer, Blows, who was involved in an incident with my client on June 9th, and thereafter on several days. The claim on the 9th arises out of the fact that when he was doing, my client came into the Orange County Correctional Facility in May of 2018, and he was prescribed an ointment to put on his body. So June 9th is the head count, right? Yes. So, I mean, it's not disputed that when an officer conducts a head count, they need to see the whole cell, right? Well, that's not necessarily the case. The head count is designed to make sure that the individual is in the cell when he's supposed to be in the cell. But you described the policy, the informal policy that the prison was following, that an inmate could cover part of the window with the toilet paper, and then, but the officer was allowed to come back to view the cell in order to complete the head count, right? That's correct. So to complete the head count, the officer does need to view the whole cell. At least that's what it seems to be. Not necessarily so. He's got to have a legitimate non-protectural justification for wanting to see the cell. In this case, there was the toilet paper on the part of the plexiglass window in the cell, but he could see- I guess my question is, if we assume, and maybe it's not a safe assumption, so I'll see what the government says about that, that you do need to see the cell to complete the head count. I mean, are you saying that the toilet paper policy is required by the Constitution, that he needs to allow him to have this time and then come back later to complete the head count? No, the toilet paper and the customs and the practices create the expectation of bodily privacy. So that when you're using the toilet in your cell, or in the case of Mr. Kenloch, he's putting an ointment on his genital area, which had been prescribed by the correctional facility. And he was permitted and authorized to self-apply it. The toilet paper and those customs create the expectation of bodily privacy in a correctional facility. So you're saying, if they didn't have that policy, there wouldn't be an expectation of privacy. But because they did, the Constitution means they can't violate it. No, the Constitution says you have to do something, you have to have a legitimate security justification, non-protectual justification for intruding on that expectation of bodily privacy. In this particular case, when he came up to the cell, he knew Kenloch was in the cell because he had a conversation with him and he could see his upper body. And Kenloch said to him, I'm applying an ointment that was prescribed and I'm naked. And Low said to him, I don't care. I don't care. I want to see it. Is your argument that these head counts are prescribed and all they can do is see the head and that's all that's necessary? No, that's not what we're saying. We're saying that there were- There is also then a safety security component to it, is there not? Not, he didn't say, what didn't he say? That is Low's, he didn't say, I need to see your cell. I'm concerned about you. I think there's something going on. Just about the count. What he said was, your honor, I want to see it. Meaning I want to see the reasonable inference on the motion for dismissal based on the lack of plausibility requires a couple things. It requires one, that there has to be a privacy interest. There is a privacy interest here. That's why they allow the toilet paper to be put on the window, and that's why they- What do you say they allow? I'm interested in the status of this alleged custom. Am I correct to assume that there is some more formal regulation that says the window has to be kept clear? I'm not aware of that since we haven't had any discovery. I think we need to go back both on the DeNovo review that you're undertaking as this court and what the court below did or didn't do. And as far as this custom, what is the basis for the allegation of the custom? Well, to give integrity- No, no, what is the basis for the allegation that this custom exists? It's just what Mr. Kenlock thinks or is aware of? Mr. Kenlock was in the, Mr. Kenlock was detained for a month before this incident occurred and was applying the ointment on a regular basis using the various policies that were in place or practices, if you will. And so he had- He's aware of what was typically allowed by the corrections officers who were doing the head count. That's correct, and he and other inmates with whom he interacted were aware of that. But you allege that Bloys didn't follow the policy, right? That is correct. With respect to Kenlock, he just didn't honor the policy. Reinforcing his position, at this stage of the litigation, we're not litigating the merits. I'm going to ask you that, so even if there is some officer who doesn't honor the toilet paper policy, because that's not how he conducts head counts. I mean, why isn't this still the kind of glimpse at an inmate that we've said is not a violation of the Constitution? He only viewed him from outside the cell to conduct the head count. He didn't go in, there was no contact, right? So why is that a constitutional violation? Your questions are probing and interesting on the merits of the case, which we might lose down the road. The only issue in this case is, did he plead facts at this point in time, which make out a plausible- Well, I'll submit- That's my question. So at this point in time, he's pleaded facts that the officer viewed him from outside the cell in conducting the head count. He didn't go in, there wasn't any contact, it was just a glimpse at him in order to do the head count check. I mean, isn't that the kind of thing we've already said is not a constitutional violation? Contextually, he did and said much more. He said, when Bloys said, when Kenlock said, I'm naked and I'm applying an ointment to my genital area in a context of a practice within the institution that would have, of which Bloys was aware that, okay, I'll come back. At that point in time, Bloys says, I don't care. I want to see it. The reasonable inference to be drawn from that is, at this stage in the litigation, on the plausibility of the invasion of privacy is whether- I suppose you're going to tell me this is- Is he didn't have a legitimate interest at that moment in time to invade the privacy, except his purient, dark voyeurism to self-interest to observe- Excuse me, Mr. Marsden. I suppose you're going to tell me this is also a factual question, but it just would seem very apparent to me, why couldn't he grab a pair of shorts or sweatpants or something on the way to the door? Did he construe this request as I want to see your penis, and therefore he said, okay, I have to show you my penis? Yeah, he did say, he does plead- He did say, he did plead to the window? He was in his cell applying- I get it. I get it. He has clothes in the cell, doesn't he? He didn't, Bloys didn't say, then put some clothes on, I'm not going to come back. What does Bloys have to say? I'm asking you, I mean, between reasonable inferences here, is his position- He did believe- Excuse me, while I ask the question, please? Sure. Is it his position that he was commanded to appear naked in front of the window? Yeah, he was of the view, and he pleads it factually, that if he didn't obey the order in the moment, that he would be subjected to discipline. He thought the order was that he should show himself naked, and that if he took half a second to throw on a pair of shorts on the way to the window, he would be disciplined. That is the- We're into a discussion. That is the reasonable assumption from the complaint. The reasonable inference from the complaint is that that's what he was being commanded to do. That's correct, and at the plausibility, at the stage where we haven't even gotten an answer in any discovery, the question is whether or not assuming the truth of the facts as they are, and not getting into a merit or credibility analysis, whether or not he, if his facts are true, and a jury would believe him to be true, whether or not it was Blose's conduct was intended to invade the expectation of bodily privacy in order to satisfy, that is Blose, own personal self-interest and not to implement a legitimate non-protectual institutional security interest or other institutional legitimate non-protectual interest. And the facts, as alleged for that point, at that point, have to be deemed true, have to have reasonable inferences. It's not an unreasonable inference that that's why Blose did it. By the way, we plead that he was known to have done this periodically or regularly with other inmates. What does that say about the so-called custom? I mean, doesn't that suggest that the custom is simply that some corrections officers do one thing and some corrections officers do something else? Now, the custom is from which the expectation arises. And he was aware of their custom, Blose, and he elected, in this particular case, and it was believed and known on other cases, to engage in self-interested conduct and not to adhere to the custom like other correctional officers would do. Once again, Kenluck was in the facility for a month without any problems applying the ointment while he was in his cell and when head counts were going on. Just as if, we could take it another way. Wait a minute, wait a minute. There's an allegation that he always is applying the ointment during head counts? No, that's not the allegation. I'm saying that during those times when he was applying it in head counts, which are periodic and sporadic, he had applied the ointment and without any problem. But it largely comes out of the fact- You've answered my question, so if you want to go on to something else. Let me just finish and wrap up. You've got a few minutes for rebuttal. Well, that's not the only claim. So retaliation claim, by the way, on the July 27th incident, which links back to the June 9th incident, he appears at Kenluck's cell and says, Hi, sexy chocolate. That fact of that comment is an equivalent admission almost. It's an admission type statement that's- You're over your time. Would you like to use rebuttal time now or reserve it for rebuttal? I'll reserve it. Thank you. We'll hear from at the least. Okay. Good morning, your honors. May it please the court. My name is Kelly Loggish. I represent the appellees, Officer Bloys, Sergeant Kiska, and Colonel Mealy. Just want to start with some initial comments with respect to the appellant's brief. And I'm sure that your honors noted this as well. The appellant repeatedly focuses on his own perception of the appellee's conduct and how it personally impacted him. But the constitutionality of that conduct is not measured by his own personal subjective beliefs. There is continual criticism of the manner in which the court below analyzed each of his claims, claiming that they were analyzed in isolation instead of viewing the events collectively. And I respectfully submit that that is because each of the claims are specific claims that implicate different constitutional amendments. Here's the fourth, the first, and the 14th. And there are different standards set forth in the case law that dictate what you need to plead in order to state a claim under the first, fourth, or 14th amendment. That's true, but if you're talking about the retaliation claim, it would be that everything that the officers did after the grievances were filed could be retaliation for the grievance, right? So you might consider those collectively because it's part of the same claim. Yes, but the case law is also clear that retaliation claims are viewed with a degree of skepticism, and they have to be pled with factual detail. And here, with respect to the retaliation against Bloy, specifically the Pat Frisk, the cell search, and the incident with the razor, each of those incidents under the case law dictates those are not adverse actions. Cell searches and Pat Frisk can even be for retaliatory reasons, but they are not considered adverse actions for purposes of a First Amendment retaliation claim. So that's- It's part of prison life, or whatever, we've said something to that effect. As an individual who is incarcerated, your rights are somewhat diminished. They are not eliminated, but- Ken Locke was locked in his cell for two hours. Well, I would submit with respect to that incident that that was over a year after. That was when he was brought back. So why does that tell us there's going to be retaliation? So there are these allegations that Bloy said, I remember you, and he did things directed at Ken Locke. Even if those in themselves are not constitutional violations, why doesn't it show that at least that Bloy was holding a grudge for a long period of time? Well, the I remember you comment actually came in the context of the initial incarceration in June. When he came back in September, I believe it was September of 2019, that this incident occurred, 14 months had passed, he had been in the jail since July of 2019, and had had no incidents with Officer Bloy whatsoever. Is that the only problem with the allegation about the lockdown, that there's a lot of time, and so we can't assume that it's retaliation for the grievances? That is not the only problem, Your Honor. It's a sporadic denial of a privilege, which is also not considered a constitutional violation. And plaintiff appellant specifically alleged in his complaint that another officer did ultimately let him out, and he received his recreation that day. So you're saying that that brief, well, two hours, I wouldn't characterize it as brief or lengthy. That two hour lockdown is not a sufficiently adverse action because given that he was then allowed out by another officer, he would not have been deterred from filing, a reasonable person would not be deterred from filing grievances by that kind of action. Yes, well, I understand that it's not judged by his own particular actions in this instance, but he did file a grievance about that incident incidentally. What I'm saying is that the case law dictates that denial of a privilege on one occasion does not rise to the level of a constitutional violation. And the time period in between- Well, it's not a constitutional violation in itself, it's a question of is it retaliatory? And I thought the idea under the First Amendment standard there is it has to be an adverse action in the sense that it is sufficient to deter a reasonable person from exercising constitutional rights. Am I mistaken about the standard? No, you are absolutely correct, Your Honor. And yes, I do not think that that is conduct that would deter an ordinary person from pursuing their First Amendment rights. Going back to this question of considering things in isolation versus not in isolation, what are we to make of this sexualized remark that occurs afterwards? Does that not lend some credence that might otherwise be lacking to the idea that the officer had some prurient interest in invading the plaintiff's privacy? I do not believe that that comment made approximately six weeks later lends any credence to the right to privacy claim. And when you look at the case law for the Fourth Amendment right to privacy, the standard is very specific and the court below correctly included, concluded rather, that the invasion of privacy was minimal and it was justified. We keep hearing that there was no justification. What was the reason? What reason is there in the record for why Officer Boise asked Kenlock to remove the tone paper? As specifically alleged in the complaint and as acknowledged in the brief and in the grievance that Mr. Kenlock filed, which is that joint appendix 23, Officer Boise was conducting a formal head count at the time. And as the court duly noted, the purpose of the head count is not just to know that the person is in the cell. Quite frankly, you know the person is in the cell already. The purpose is to ensure the safety and security of that person in the cell. And just by the fact that he's conversing with you and you can't see him does not mean that he's safe and secure. So you need to know whether there's someone else in the cell as well as whether he is in the cell. Is that the underlying point? It's not necessarily to know whether someone else is in the cell. It's to know what is that individual inmate doing at the time in his cell. I have to accept the facts that were pled as true. And your honors have questioned also the legitimacy of this sort of informal practice of being allowed to cover up your window in a correctional facility where the primary role of the correction- My question is, what precisely is the purpose of the head count? I thought it was a count to make sure that all prisoners are accounted for. It is a count, but it is also to visualize the person in that cell to ensure their safety and security. To make sure that, what, he's not suffering a stroke at the time? To make sure there's no medical emergency. To make sure he's not trying to harm himself. To make sure he's not engaging in behavior that he should not be engaging in. Okay, and the other question goes to the alleged informal custom. Are you in a position to make any representation, or do you have any knowledge, of whether there are formal rules and regulations respecting, obscuring the window or porthole in the cell? I did not specifically address that because I had ascertained that that was really a formal policy, I can speak to that. You're not allowed to cover your windows in a correctional facility, individual inmates are disciplined for that. I would think that is true from the various experiences I have had with prisons. But is there any formal regulation that you are aware of that specifies that you're not supposed to block the window? I am not aware of a specific formal regulation. It would be within the jail's internal policies and procedures. Well, doesn't the complaint allege that in the head count the officer had to see the cell? That's why the toilet paper policy was that the officer would come back later to finalize the head count when the toilet paper could be removed, right? So even the allegations suggest that there was a requirement to eventually see the cell. Yes, absolutely. There is a requirement to be able to see in the cell and see the individual inmate inside of the cell. Not just know that they're inside the cell and speak to them. The point of the head count, again, is to ensure their safety and security inside of the cell. There's another peculiarity about the complaint, and I'm not sure which way it cuts. But there's a pattern in these allegations that, for example, at one point, Mr. Kenlock is told that an order has been issued to Blois to stay away from him. And there are some other facts that tend to corroborate that, at least as alleged. Then there is the incident with the pat-down. And I take it your position is that the pat-down is just one of those normal incidents of jail behavior, which makes sense to me. But the supervising officer says, okay, no, Blois can't do that. I'll get some other male officer to do that, and that's what happens. There is the episode where Blois supposedly locks him in the cell, we want to unlock it. Somebody else comes along and unlocks it. You start to wonder whether everybody in the prison knows there's something funny about Blois, or at least about Blois' relationship with Kenlock, that there is this repeated pattern of other officers saving the day, as it were, at least from the vantage point of was there a serious retaliation or did something bad happen? And I guess I don't know what to make of that. But it is the case, right, that it is alleged that Blois was told to stay away from him. It is alleged that Blois was told to stay away from him, but in a subsequent grievance, I believe it was the second grievance that Mr. Kenlock filed, the grievance coordinator very specifically notes that there is no stay away order. There's no order in existence that says that Blois cannot go near the plaintiff. Okay. I believe that's JA 27, Your Honor. Thank you, Counsel. Thank you. Mr. Marsden, you deserve two minutes for your vote. Thank you, Your Honor. Just a couple of clarifications. On June 23rd, which was the next incident after June 9th, Blois comes by the cell and says, I remember you. He then goes into the cell, searches the cell, and pat down Mr. Kenlock. Mr. Kenlock then goes to the block sergeant in the presence of Blois and tells him that he believes that Blois acted without any legitimate basis for doing it. But really to retaliate against him because he and Mr. Kenlock had filed a grievance and a PREA petition. PREA is a Prison Rape Elimination Act, a federal act, to try and eliminate sexual harassment, among others, and rape within the secret societies of our jails and prisons. And at that time, the sergeant tells Blois, to make your point, Judge Lynch, stay away from him. Don't go back to his cell. Stay away from him. And in fact, he goes back. He alleges that, but actually he files a grievance over that incident. Correct. One of the reasons why the grievance is denied is because the officer finds that there was no stay away order that Blois violated, right? Well, that's a different incident. You're saying there was a new stay away order after that search? There was a specific stay away order by the sergeant, as alleged in the complaint, at the time. The other stay away order was at a different time in a different context. And that's where the debate is about whether there was that stay away order or not a stay away order. There is no debate about whether on June 23rd, as alleged, the stay away order was issued in the presence of Blois by the sergeant and in the presence of Mr. Kenlock. I want to suggest, too, that the July 27th reference to sexy chocolate is just one aspect of what Blois said on that day. On that day, he said, hey, sexy chocolate, my client, Mr. Kenlock, responds, stop harassing me in the context of what was then going on. At which time, Blois says, shut up, get over it. Get over it, and the reasonable inferences is stop complaining about my conduct like you did on June 9th. You filed a PREA complaint, and you filed a grievance. You, on June 23rd, have done so. On July 27th, I'm telling you, shut up and get over it. So everything has factual context in this complaint from June 9th, actually from June 9th going forward. And at this point in time, in the context of what you are asking this court to do, on a de novo review of the dismissal of certain claims because of their lack of plausibility. We're asking you to reverse, because what this court, what the court below did under the guise of plausibility is to assess credibility, make findings of fact, make unjustified and inappropriate inferences in favor of the appellee. Not in favor of Mr. Kenlock, as is required under the standards of the analysis. And what's really happening, I'll wrap up. What's really happening is that the Iqbal standard of plausibility has been applied in district courts, circuit courts, and the Supreme Court in a way that strangles. I don't think you want to say that. What you're saying is that the Supreme Court and this court have interpreted Iqbal in a way that is not advantageous to your case. And if that is the case, then you lose. Because if we and the Supreme Court have done and countenanced what you are complaining about, then unfortunately we can't do anything about that. So I think you don't want to go there. Well, I just want to say that it's driving, and the academics that have studied this and written about it, to which we cite the brief. You're getting into a policy debate about the Iqbal standard. And whether the academics like it or not, something significant has changed about the way 12B6 motions are decided from the way they were decided when I first became a judge under Gibson and Connolly. Life is different, get over it, so to speak. So I don't think we're in a position to make a policy determination that the way Iqbal has been, according to you, construed universally by courts is a problem. Maybe it's a problem, but it's a problem for the Supreme Court, or for an in-bank version of this. I totally understand what you're saying and don't disagree with you. I'm not asking you to overrule the Supreme Court or overrule other panels or other courts, circuit courts. What I'm suggesting is, in that context, how is that happening? And it's happening because of what happened in this case. There is a- So your argument is the Iqbal standard doesn't actually require this result? Right. That's your argument. That's absolutely correct. I think we have that. Thank you, counsel. Thank you both. We'll take the case under advisory.